**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 14-cv-00323-REB-KLM

COMPLIANCE SOLUTIONS OCCUPATIONAL TRAINERS, INC., a Colorado corporation,

    Plaintiff,

v.

SAFETY HELPERS, LLC, DELINQUENT APRIL 1, 2012, a Colorado limited liability company, and
KYLE KNEBEL, an individual,

    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR CONTEMPT**

**Blackburn, J.**

    This matter comes before me on **Plaintiff's Motion for Contempt** [#24],[1] filed April 10, 2014. Plaintiff seeks to have me find defendants in contempt of the court's **Order** [#21], filed February 18, 2014, granting the parties' stipulation regarding use by defendants of the trademark-in-suit during the pendency of this litigation. On July 18, 2014, I held an evidentiary hearing on the matters raised by and inherent to the motion. Having considered the arguments and authorities presented in the motion, the response, and the reply, and the evidence and arguments presented at the hearing, I enter the following findings of fact, conclusions of law, and orders.

---

[1] "[#24]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

## I. FINDINGS OF FACT[2]

1. Plaintiff designs, develops, and conducts web-based and in-person training focusing on occupational health and safety and remediation. It has used the name "Compliance Solutions" in commerce since its inception in 1995.

2. In 2010, plaintiff registered the trademark "Compliance Solutions: Today's Training . . . Tomorrow's Solution." (*See* Hrg. Exh. 1.)

3. Defendant Kyle Knebel was employed by plaintiff as a customer sales representative. In October, 2010, while still employed by plaintiff, Mr. Knebel and his father formed defendant Safety Helpers, LLC. Mr. Knebel resigned his employment with plaintiff in April, 2011. Safety Helpers is a direct competitor of plaintiff.

4. Plaintiff filed this lawsuit after it became aware that Mr. Knebel had acquired the domain name "ComplianceSolutionsUSA.com" and was operating a website under that name. Mr. Knebel allegedly also had acquired 17 different domain names, all incorporating, with minor variations, the terms "Compliance Solutions."[3] In addition, Mr. Knebel used the designation "Compliance Solutions USA" in other online social media outlets, such as LinkedIn, Twitter, Zevents, and Facebook, as well as in association with an online blog.

---

[2] Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

[3] To wit: ComplianceSolution.co; ComplianceSolutionsUS.com; ComplianceSolution.us; ComplianceSolutions1.com; ComplianceSolution.biz; ComplianceSolutions.mobi; ComplianceSolution.mobi; ComplianceSolutions.me; ComplianceSolution.ws; ComplianceSolutions.cc; ComplianceSolutions.ws; Compliance-Solutions.ws; Compliance-Solutions.mobi; Compliance-Solutions.co; Compliance-Solutions.me; ComplianceSolution.me. (**Complaint** ¶ 16 at 3.)

5. Plaintiff herein alleges claims for trademark infringement under the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) & (d)(1)(A), and Colorado state trademark law, as well as state law claims for unfair competition and violation of the Colorado Consumer Protection Act, § 6-1-101 *et seq.*, C.R.S.

6. On February, 7, 2014, plaintiff filed a motion seeking to enjoin defendants from using plaintiff's mark in commerce. (*See* **Plaintiffs' Motion For Temporary Restraining Order** [#11] filed February 7, 2014.)  The court set the matter for hearing on February 19, 2014, and commissioned a response and reply. (*See* **Scheduling Order** [#14], filed February 10, 2014.)  Defendants timely filed their response. (*See* **Response to Plaintiff's Motion for a Temporary Restraining Order** [#17], on February 14, 2014.)  On the day set for plaintiff's reply, the parties instead submitted a **Stipulated Motion For Entry of Order on Plaintiff's Motion For Temporary Restraining Order**. **(**[#20], filed February 18, 2014.)

7. By order entered that same day, the court granted the parties' stipulated motion and entered an order based thereon.  That order provides, in relevant part,

> 2. That defendants will immediately and until the resolution of this case, cease imitating, copying, or making any use of the "Compliance Solutions" or any confusingly similar mark including, but not limited to, operating websites with domain names containing the words "Compliance Solutions";
>
> 3. That defendants will immediately, and until the resolution of this case, cease maintaining online social media, business, or networking accounts or sites under a name containing the words "Compliance Solutions" or any confusingly similar mark including, but not limited to, blogs, LinkedIn, Facebook, Twitter, Google Plus, Blogger.com, Manta, Chirrpy, You Tube and Zvents;

(*Id.* ¶¶ 2-3 at 2.)[4] Mr. Knebel acknowledged that he was aware of the existence and content of this order.

    8. On or about March 31, 2014, plaintiff learned that defendants were using the designation "Compliance Solvers by Safety Helpers, LLC" on websites, Facebook, Twitter, Zvents, LinkedIn, and blogspot, among others. (*See* **Motion App.**, Exh. 2; Hrg. Exhs. 3, 4, 4A, 5, 5A, 6, 6A7, 8, 9.)

    9. The first segment of this designation – "Compliance Solvers" – is similar to the portion of plaintiff's mark– "Compliance Solutions" – covered by the court's order. (***But see supra*** note 4.) The first words are identical, and the second words are similar in sound and meaning.

    10. Despite plaintiff's demand, defendants continue to use the "Compliance Solvers by Safety Helpers, LLC" designation in marketing and otherwise.

    11. Safety Helpers' business overlaps plaintiff's to a significant extent, and the two companies are direct competitors in the industry of Internet-based occupational safety training. However, unlike plaintiff – which also engages in telemarketing to sell services to new and existing customers – Safety Helpers attracts business entirely through the Internet.

    12. The term "compliance" is used throughout the industry in which both parties operate to describe the type of services they offer. Use of that term therefore is at least

---

[4] I note that the language of the parties' stipulation appears to offer plaintiff more protection than properly afforded by its registered trademark, which claims the company's logo and tagline as a whole ("Compliance Solutions: Today's Training . . . Tomorrow's Solution") and specifically states that "NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE 'COMPLIANCE SOLUTIONS' APART FROM THE MARK AS SHOWN." (Hrg. Exh. 1.)

4

helpful in directing interested customers to these services. Indeed, Jeffrey Kline, president of Compliance Solutions, testified that when his company first established an Internet presence in 1998, the domain name "Compliance Solutions" was not available. Plaintiff's website is www.csregs.com.

13. Following entry of the court's February 18 order, Mr. Knebel immediately ceased using the compliancesolutionsusa.com website. Nevertheless, he testified that he felt he still needed a domain name that included the term "compliance" because that term is descriptive of the type of services he offers.

14. Thus, following entry of the court's order, Mr. Knebel consulted www.godaddy.com, a website that sells Internet domain names, in search of available domain names that included the word "compliance" but did not violate the terms of the court's order. He explained that he searched many dozens of combinations of potential names, including those that incorporated his own business's name, but found that every combination of words he tried was not available.

15. Ultimately, however, Mr. Knebel found one domain name available for purchase – Compliance Solvers. Mr. Knebel Googled "Compliance Solvers" and found no evidence that plaintiff had never used those terms in marketing its services. (*See* Hrg. Exh. 12.)

16. Mr. Knebel then consulted his attorney. Based on advice of counsel, Mr. Knebel determined that using "Compliance Solvers by Safety Helpers, LLC" would not violate the order. Mr. Knebel included the designation "by Safety Helpers, LLC" with his use of the name Compliance Solvers across his online platforms in an abundance of caution, even though he testified that doing so makes his website "look terrible."

17. Mr. Knebel acknowledged that he did not contact the court or plaintiff or plaintiff's counsel to inquire as to their respective positions regarding the propriety *vel non* of his making use of the "Compliance Solvers by Safety Helpers, LLC" name or operating websites incorporating that name in the domain and/or the content thereof.

18. Mr. Kline testified that a recent Google search for his company's name returned a result for the Compliance Solvers by Safety Helpers, LLC, website.

19. Although Mr. Knebel has registered the domain name "compliancesolutions.training" (Hrg. Exh. 13), the site is not and has never been in use and is presently nonoperational.

20. There was no credible evidence to suggest that a business listing for "Compliance Solutions USA" posted on www.hotfrog.com (*see* Hrg. Exh. 15) was connected in any way with Mr. Knebel or Safety Helpers.[5]

21. There was no evidence presented that any actual or potential customer of plaintiff was confused by the similarities between "Compliance Solutions" and "Compliance Solvers by Safety Helpers, LLC." Nor was there any evidence suggesting that plaintiff has lost business or revenue or that its corporate goodwill has been impaired or affected by defendants' adoption of the name "Compliance Solutions by Safety Helpers, LLC."

22. Mr. Kline testified that his company has spent "about $11,000, $12,000, right around there" in attorney fees to prosecute the instant motion. Plaintiff also submitted in

---

[5] Counsel's suggestion that Mr. Knebel did not disprove his connection to this posting evidences a profound misunderstanding of the burden of proof. Moreover, I found Mr. Knebel's testimony to the effect that he has no idea what hotfrog is and has never posted a listing on that website to be fully credible.

evidence a copy of its April, 2014, bill from its attorneys in the amount of $5,681.00. (Hrg. Exh. 11.)  Entries in that bill show that lead counsel for plaintiff expended time (at a rate of $485/hour) on some matters that might have more properly been assigned to a junior attorney or paralegal and thus evidences some lack of billing judgment.

## II.  CONCLUSIONS OF LAW

1.  I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (Lanham Act), and 1367(a) (supplemental jurisdiction).  I have authority to punish violation of my duly issued orders by civil contempt pursuant to 18 U.S.C. § 401(3) and the court's inherent authority.  **See Young v. United States ex rel. Vuitton et Fils S.A.**, 481 U.S. 787, 793, 107 S.Ct. 2124, 2130, 95 L.Ed.2d 740 (1987); **Stransky v. HealthONE of Denver, Inc.**, 929 F.Supp.2d 1100, 1113 (D. Colo. 2013).

2.  "Civil contempts provide a remedy for a party who has been injured by the violation of a court order."  **Hyde Construction Co. v. Koehring Co.**, 388 F.2d 501, 511 (10th Cir.), **cert. denied**, 88 S.Ct. 1654 (1968).  Unlike criminal contempt, which seeks to punish a party for past acts, civil contempt is remedial in nature and seeks to compel compliance with a court order for the benefit of the complainant.  **International Union, United Mine Workers of America v. Bagwell**, 512 U.S. 821, 827-28, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994); **Home Design Services, Inc. v. B & B Custom Homes, LLC**, 2008 WL 927683 at *2 (D. Colo. Apr. 3, 2008).

3.  "Sanctions for civil contempt may only be employed for either or both of two distinct remedial purposes: (1) to compel or coerce obedience to a court order . . .; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's

noncompliance[.]" ***O'Conner v. Midwest Pipe Fabrications, Inc.***, 972 F.2d 1204, 1211 (10th Cir. 1992) (citation and internal quotation marks omitted).[6] Nevertheless, even though "[c]ivil contempt is an appropriate remedy for the enforcement of a judicial decree, [] it is a severe one which should be used only when necessary to sustain the authority of the court." ***NLRB v. Shurtenda Steaks, Inc.***, 424 F.2d 192, 194 (10th Cir. 1970).

4. Plaintiff here seeks coercive contempt sanctions, which "look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order." ***Latrobe Steel Co. v. United Steelworkers***, 545 F.2d 1336, 1344 (3rd Cir. 1976). Specifically, plaintiff asks that defendants be fined $2,500 per day until such time as they cease using the allegedly confusingly similar mark. ***See O'Connor***, 972 F.2d at 1211; ***General Signal Corp. v. Donallco, Inc.***, 787 F.2d 1376, 1380 (9th Cir. 1986). It also seeks to recover its attorney fees expended in seeking to enforce the order.

5. Defendants have been provided proper notice and the hearing required by law prior to the consideration of a finding of civil contempt. ***See Home Design Services, Inc.***, 2008 WL 927683 at *4.

6. Two witnesses testified at the hearing: Jeffrey Kline, president of Compliance Solutions; and defendant Kyle Knebel, founder of Safety Helpers. In determining the credibility and weight to be given to each witness who testified during the hearing, the

---

[6] Although Federal Rule of Criminal Procedure governs motions for criminal contempt, there is no corresponding procedural rule applicable to civil contempts. ***Home Design Services, Inc.***, 2008 WL 927683 at *4.

court considered all facts and circumstances shown by the evidence that affected the credibility of each witness, including the following factors: the witness's means of knowledge, his ability to observe, and his strength of memory; the manner in which each witness might be affected by the outcome of the trial; the relationship each witness has to either side in the case; and the extent to which each witness is either supported or contradicted by other evidence presented.

7. A finding of civil contempt is proper where (1) a valid court order existed; (2) the respondent had knowledge of that order; and (3) the respondent disobeyed that order. ***FTC v. Kuykendall***, 371 F.3d 745, 756-57 (10th Cir. 2004). The moving party is required to establish a prima facie case of contempt by demonstrating that certain conduct was required by a previous court order and that the alleged contemnor failed to comply with that order. ***United States v. Hayes***, 722 F.2d 723, 725 (11th Cir. 1984). The burden of proof is clear and convincing evidence. ***Spectra Sonics Aviation, Inc. v. Ogden City***, 1991 WL 59369 at *2 (10th Cir. April 19, 1991).

8. There is no dispute here that a valid court order existed and that Mr. Knebel had knowledge of that order. Thus, the only issue to be resolved is whether defendants' use of "Compliance Solvers by Safety Helpers, LLC" violates that order. I find and conclude that plaintiff has not carried its burden of proof to establish such a prima facie violation by clear and convincing evidence.

9. The touchstone of liability for trademark infringement is whether defendants' use of the designation "Compliance Solvers by Safety Helpers, LLC" "'is likely to cause confusion' in the marketplace concerning the source of the different products.'" ***Beer***

***Nuts, Inc. v. Clover Club Foods Co.***, 805 F.2d 920, 924 (10th Cir. 1986) ("***Beer Nuts II***) (quoting 15 U.S.C. § 1114(1)(a)).  In determining the likelihood of confusion, the court may consider several factors:

> (a) the degree of similarity between the designation and the trade-mark or trade name in
>
>> (I) appearance;
>> (ii) pronunciation of the words used;
>> (iii) verbal translation of the pictures or designs involved;
>> (iv) suggestion;
>
> (b) the intent of the actor in adopting the designation;
>
> (c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed the other.
>
> (d) the degree of care likely to be exercised by purchasers.

***Beer Nuts, Inc. v. Clover Club Foods Co.***, 711 F.2d 934, 940 (10th Cir. 1983) ("***Beer Nuts I***") (quoting **RESTATEMENT OF TORTS** § 729, at 592-93 (1938)).  "[T]hese factors are interrelated and must be considered as such in assessing the likelihood of confusion." ***Beer Nuts II***, 805 F.2d at 925.  Other considerations also may be relevant to assessing the likelihood of confusion in a particular case.  ***See Coherent, Inc. v. Coherent Technologies, Inc.***, 736 F.Supp. 1055, 1063-64 (D. Colo. 1990), ***aff'd***, 935 F.2d 1122 (10th Cir. 1991).

10.  In assessing the first factor, the court must examine the sight, sound, and meaning of the marks "in the context of the marks as a whole as they are encountered by consumers in the marketplace." ***King of the Mountain Sports, Inc. v. Chrysler Corp.***, 185 F.3d 1084, 1090 (10th Cir. 1999) (citation and internal quotation marks

omitted).

11. There can be little question but that the first portion of "Compliance Solvers by Safety Helpers, LLC" is similar in sight, sound, and meaning to "Compliance Solutions." The first term – compliance – is plainly identical, and the second has a similar sound and meaning, and indeed, derives from the same linguistic root – "solving" a problem is the act or process of finding "solutions."

12. Nevertheless, Mr. Knebel testified – credibly, in this court's estimation – that the term "compliance" is used throughout the industry to describe the type of services offered by both plaintiff and defendants. Although the present motion is not the appropriate vehicle to make a determination as to whether that term is or has become generic for purposes of plaintiff's trademark claims, *see Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544 (10th Cir. 2000), or whether the affirmative defense of fair use is implicated in this case, *see Coherent, Inc. v. Coherent Technologies, Inc*., 736 F.Supp. 1055, 1061 (D. Colo. 1990), I find that the greater weight of the credible testimony supports the conclusion that the term "compliance" is widely used in the industry and is, at the very least, helpful in driving interested Internet customers to the type of services both parties offer.[7]

13. Mr. Kline testified that when he performed a Google search for his company's name, the Compliance Solvers by Safety Helpers, LLC, website appeared in the results. However, there was nothing in this testimony or otherwise – other than Mr. Kline's own rank speculation – to suggest that the similarities in the two names has

---

[7] Indeed, Mr. Kline testified that when plaintiff first established an Internet presence in 1998, the domain name "compliance solutions" was not available – thus plaintiff's website is www.csregs.com.

11

caused any actual or potential customers to be confused or otherwise to associate defendants' business with Compliance Solutions. Nor was their any evidence presented to suggest that plaintiff had suffered any actual loss of business or revenue as a result of defendants' use of the designation "Compliance Solvers by Safety Helpers, LLC."[8]

14. There was no credible evidence to support plaintiff's assertion that Mr. Knebel's intent in adopting "Compliance Solvers by Safety Helpers, LLC" was to trade off the goodwill of Compliance Solutions. Mr. Knebel described in detail his reasons for acquiring the Compliance Solvers domain name and the process he undertook to ensure that he was within the bounds of the court's order prior to acquiring and using the name. The court finds this testimony fully credible. Nothing else in the record before the court suggests that Mr. Knebel intended to appropriate plaintiff's corporate goodwill, much less that plaintiff's goodwill has been adversely effected by defendants'

---

[8] Although attorney fees expended in seeking to enforce the order may be recoverable if contempt is otherwise proved, *see **Allied Materials Corp. v. Superior Products Co.***, 620 F.2d 224, 227 (10th Cir. 1980), whether attorney fees are recoverable when untethered from any actual monetary losses occasioned by the alleged violation of the court's order is less clear.

In any event, plaintiff has failed to prove entitlement to the recovery of such costs:

> A compensatory fine in a civil contempt suit "must of course be based upon evidence of complainant's actual loss." ***United States v. United Mine Workers***, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). In the absence of evidence showing the amount of the loss, any sum awarded by the court is speculative and therefore arbitrary. ***Yanish v. Barber***, 232 F.2d 939, 944 (9th Cir. 1956). The court must have some basis for determining not only the amount, but the reasonableness of costs claimed. ***Lichtenstein v. Lichtenstein***, 425 F.2d 1111, 1113-14 (3rd Cir. 1970).

*Id.* Mr. Kline testified only that plaintiff had expended "about $11,000, $12,000, right around there" in attorney fees to prosecute the instant motion. (*See also* Hrg. Exh. 11 (attorney fee bill for April, 2014).) Even if plaintiff could establish that all fees so expended were reasonable – a proposition which seems dubious based on the scant evidence submitted (*see id.* (showing plaintiff's lead counsel, billing at a rate of $485 per hour, performing work such as "conduct internet searches")) – this vague testimony certainly would be inadequate to support an award of attorney fees in such an amount to plaintiff.

use of the designation "Compliance Solvers by Safety Helpers, LLC."

15. Plaintiff's suggestion that inclusion of the phrase "by Safety Helpers, LLC" in conjunction with the Compliance Solvers name offers no defense to a charge of infringement overstates the law. There is no firm and fast rule as to whether addition of a "house mark" will forestall a finding of infringement, and each case must be judged on its own facts, based on "comparison of the conflicting marks as a whole:"

> The better reasoned view. . . is to consider the question of whether or not the trade name is actually likely to add to or to lessen customer confusion. . . . While the use of the trade name along with the trademark by either or both parties does not immunize the defendant from infringement, it also cannot be disregarded. Instead, it is another element to be considered in determining the likelihood of confusion.

4 McCarthy, **McCarthy on Trademarks and Unfair Competition** § 23:43 (4th ed.) (footnotes omitted).

16. Based on the evidence presented here, I find and conclude that the inclusion of the terms "by Safety Helpers, LLC" in conjunction with the use of the Compliance Solvers name was intended to help further differentiate defendants' name from plaintiff's mark, not to sow confusion or to trade off plaintiff's goodwill. Indeed, Mr. Knebel includes the designation "by Safety Helpers, LLC" repeatedly throughout his various online fora despite the fact that doing so makes those sites "look terrible."

17. Nor do I find that Mr. Knebel's registration of the domain name "compliancesolutions.training" constitutes a violation of the court's order. The order expressly prohibits defendants from "making [] use" of a confusingly similar mark and/or "operating" a website with a confusingly similar domain name. Mr. Knebel is not presently using or operating the "compliancesolutions.training" website. Nothing in the

order prevents him from registering such domain name.[9]

18. Thus, I find that plaintiff has failed to prove by clear and convincing evidence that Mr. Knebel disobeyed the court's order by using a confusingly similar mark in any domain name or online social media, business, or networking account or site. The motion therefore must be denied.

19. Moreover, even if plaintiff had established a technical violation of the order, I would find no basis on which to find defendants in contempt. *See **United International Holdings, Inc. v. The Wharf (Holdings) Ltd.***, 210 F.3d 1207, 1236–37 (10th Cir. 2000) (court retains "broad discretion" to determine whether the exercise its authority to hold party in contempt even when prima facie case has been made), *aff'd*, 121 S.Ct. 1776 (2001); ***Braintree Laboratories, Inc. v. Nephro-Tech, Inc.***, 99 F.Supp.2d 1300, 1303 (D. Kan. 2000) (same.)

20. Although a party's intent, and any associated good faith, is not relevant to a finding of contempt, *see **McComb v. Jacksonville Paper Co.***, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); ***Universal Motor Oils Co. v. Amoco Oil Co.***, 743 F.Supp. 1484, 1487 (D. Kan. 1990), such matters are relevant in considering the defense of substantial compliance, *see **Spectra Sonics Aviation***, 1991 WL 59369 at \*2; ***Fistell v. Suthers***, 2012 WL 4127313 at \*2 (D. Colo. Sept. 19, 2012). The standard of proof for this affirmative defense is clear and convincing evidence. ***Fistell***, 2012 WL 4127313 at \*2; ***Bad Ass Coffee Co. of Hawaii, Inc. v. Bad Ass Coffee Ltd. Partnership***, 95 F.Supp.2d 1252, 1256 n.8 (D. Utah 2000)

---

[9] Indeed, in the event that this lawsuit is ultimately resolved in favor of defendants, their action in securing this domain name may appear to have been prescient.

21. Here, the evidence establishes, clearly and convincingly, that Mr. Knebel took all reasonable steps and did in fact substantially comply with the court's order. I find credible Mr. Knebel's testimony that the term "compliance" is descriptive of the type of services Safety Helpers offers and that incorporation of that term in a domain name that would lead potential customers to the company's website is important to generating business. Mr. Knebel thus performed an exhaustive search for any available website domain names that incorporated the word "compliance." He testified credibly that "Compliance Solvers" was the only domain name that resulted from this research. He then plugged the words "compliance solvers" into a search engine and found that plaintiff had never used those two terms together in its marketing. Going further, he consulted counsel and received advice that led him to conclude that he could use domain names including this particular combination of words without running afoul of the order. Finally, he affixed the further clarifying designation "by Saftey Helpers, LLC" to all uses of "Compliance Solvers" to dispel any notion that his business was associated with plaintiff's company. I thus find and conclude by clear and convincing evidence that Mr. Knebel's actions in adopting the Compliance Solvers by Safety Helpers, LLC, name were based on a good faith, reasonable interpretation of the court's February 18 order. ***Spectra Sonics Aviation***, 1991 WL 59369 at *2.

22. Plaintiff's intimation that such a conclusion is insupportable because Mr. Knebel did not contact opposing counsel or the court prior to adopting the Compliance Solvers by Safety Helpers, LLC, name is without merit. It defies logic to suggest that a party to litigation is required to ask his opponent's permission in circumstances such as

these – the answer seems a foregone conclusion[10] – and plaintiff's interpretation of the order would not be dispositive in any event. Nor would it have been proper for the court to issue what would in effect constitute an advisory opinion on the matter had defendants so inquired.

23.  A finding of contempt therefore would not be warranted even if plaintiff had established a violation of the court's order.

**THEREFORE, IT IS ORDERED** that  **Plaintiff's Motion for Contempt** [#24], filed April 10, 2014, is **DENIED**

Dated July 24, 2014, at Denver, Colorado.

**BY THE COURT:**

*/s/ Bob Blackburn*
Robert E. Blackburn
United States District Judge

---

[10]  Especially in light of the fact that the instant suit represents the third time plaintiff has sued Mr. Knebel.